481 F.2d 162
 5 ERC 1611, 3 Envtl. L. Rep. 20,634
 BUCKEYE POWER, INC., et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
EAST KENTUCKY RURAL ELECTRICAL COOPERATIVE CORPORATION et
al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
BIG RIVERS RURAL ELECTRIC COOPERATIVE CORPORATION et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 72-1628, 72-1629 and 72-1632.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 9, 1973.
Decided June 28, 1973.
 
 Leslie henry, Wilson W. Snyder, Toledo, Ohio, on brief, for all petitioners; Fuller, Henry, Hodge & Snyder, Toledo, Ohio, of counsel.
 William D. Ruckelshaus, Admr., John R. Quarles, Gen. Counsel, Environmental Protection Agency, Washington, D. C., Kent Frizzell, Asst. Atty. Gen., Land & Natural Resources Div. Dept. of Justice, Edmund B. Clark, Appellate Section, Peter R. Steenland, Washington, D. C., John E. Varnum, Alexandria, Va., for appellees.
 Ed W. Hancock, Atty. Gen., David B. Beals, Kenneth A. Howe, Asst. Attys. Gen., Frankfort, Ky., for Commonwealth of Kentucky, intervenor; John E. Varnum, Appellate Section, Dept. of Justice on brief.
 Before WEICK and PECK, Circuit Judges, and CECIL, Senior Circuit Judge.
 WEICK, Circuit Judge.
 
 
 1
 The petitioners are public utility companies which operate power plants within the State of Ohio and the Commonwealth of Kentucky. Pursuant to the Clean Air Act Amendments of 1970, 42 U.S.C. Secs. 1857 to 1858 (1973 Supp.), Ohio and Kentucky submitted pollutionabatement plans to the Administrator of the Environmental Protection Agency (EPA). The implementation plans, with minor exceptions not here relevant, were approved by the Administrator.
 
 
 2
 The public utility companies have petitioned this Court, under the provisions of 42 U.S.C. Section 1857h-5(b)(1), to review the Administrator's action in approving the state plans.
 
 
 3
 Petitioners then filed a motion in this Court to require the Agency (EPA) to supplement the record with transcripts of the public hearings held in Ohio and Kentucky in connection with the adoption of the plans, to determine the scope of review, and to remand to the Agency for compliance with our determinations. Briefs and appendices were filed, and the motion and the Agency's response thereto were argued orally to the panel.
 
 
 4
 Petitioners contend that the approval of the state plans by the Administrator violated the law in three particulars, namely, (1) the Administrator did not permit interested parties, including the petitioners, to participate in the proceedings through submission of written data, views and arguments, as required by Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553 (1967); (2) the plans were approved without regard to the fact that it is impossible for the petitioners to comply with the standards of the plans; and (3) the plans were approved without the filing of an Environmental Impact Statement.
 
 
 5
 We hold that the Administrator's approval of the Ohio and Kentucky plans without permitting participation by interested parties was a violation of the Administrative Procedure Act. We further hold that it was not necessary that the Administrator conduct full-scale hearings on the impossibility-claims of the individual petitioners, such claims being assertable as a defense in future federal or state enforcement proceedings. We hold that the Agency need not supplement the record with transcripts of the public hearings in Ohio and Kentucky. Finally, we hold that the Administrator was not required under the National Environmental Policy Act, 42 U.S.C. Secs. 4321 to 4347 (1973 Supp.), to file an Environmental Impact Statement prior to the approval of the state pollution-abatement plans.
 
 HISTORY AND STRUCTURE OF THE CLEAN AIR ACT
 
 6
 The problem of air pollution in the United States has been under the consideration of Congress for many years. In 1955 the Committee on Interstate and Foreign Commerce reported favorably on the basic legislation establishing the federal air pollution research and technical assistance program which became Public Law 159 of the 84th Congress, 69 Stat. 322.
 
 
 7
 On a somewhat regular basis, this initial legislation has been modified to improve, strengthen and accelerate programs for the abatement and prevention of air pollution. Pub.L. 88-206, 77 Stat. 392; Pub.L. 89-272, 79 Stat. 992; Pub. L. 90-148, 81 Stat. 485.
 
 
 8
 However, it was not until the Clean Air Act Amendments of 1970 that Congress restructured the Act in a manner designed to insure unequivocally the reduction of air pollution. The House Report on the 1970 Amendments put it this way:
 
 
 9
 "The purpose of the legislation reported unanimously by your committee is to speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again. The Air Quality Act of 1967 (Public Law 90-148) and its predecessor acts have been instrumental in starting us off in this direction. A review of achievements to date, however, make abundantly clear that the strategies which we have pursued in the war against air pollution have been inadequate in several important respects, and the methods employed in implementing those strategies often have been slow and less effective than they might have been." (H.Rep.No. 91-1146, 91st Cong., 2d Sess. 1 (1970); 3 U.S.Code Cong. & Admin. News 5356 (1970)).
 
 
 10
 The 1970 Clean Air Act Amendments, in an effort to achieve the goal of elimination of air pollution, revamped the entire predecessor legislation. It incorporated a dual (state-federal) approach to curbing air pollution and provided substantial penalties for failure of compliance, i. e., not more than a $25,000-fine per day or one year imprisonment, or both, for the first conviction, and a $50,000-fine per day or two years' imprisonment, or both, for a violation after the first conviction. 42 U.S.C. Sec. 1857c-8(c) (1973 Supp.).
 
 
 11
 The numerous and detailed provisions of the 1970 Act make it indeed intricate. A basic outline of its structure, however, will facilitate the understanding of the contentions of the parties here.
 
 
 12
 Within thirty days after enactment of the 1970 Act the Administrator of the EPA was required to promulgate and publish national ambient [general atmospheric] air quality standards for major air pollutants. These standards were subdivided into two major groups: primary ambient air quality standards, and secondary ambient air quality standards.[1] 42 U.S.C. Sec. 1857c-4 (1973 Supp.).
 
 
 13
 Following publication of these standards, each state was required to hold public hearings and to adopt a plan within guidelines provided by the Administrator and published in the Code of Federal Regulations, for the aid of the states, such plan providing for the implementation, maintenance and enforcement of national primary and secondary ambient air quality standards. The state plans had to provide for the attainment of primary standards within three years of the date of approval of the plans. Moreover, the plans had to be completed and sent to the Administrator for approval within nine months of the date of promulgation of the air quality standards. 42 U.S.C. Sec. 1857c-5 (1973 Supp.).
 
 
 14
 After these state plans were submitted to him, the Administrator was required to approve or disapprove them (or portions thereof) within four months. Specifically, the Act provides:
 
 
 15
 "(2) The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that-
 
 
 16
 (A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e) of this section) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained; . . . ." (42 U.S.C. Sec. 1857c-5(a) (1973 Supp.)).
 
 
 17
 After the approval or disapproval of a state plan by the Administrator, interested parties who desired to review his action were required within thirty days to file a petition for review in the United States Court of Appeals having jurisdiction over their area. Section 1857h-5(b)(1) of Title 42 U.S.C. provides:
 
 
 18
 ". . . A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c-5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, . . . ."
 
 
 19
 If a party fails to petition for review of the approval or disapproval of a state plan as prescribed by Section 1857c-5(b)(1), he is thereafter precluded from asserting the impropriety of the Administrator's action in this regard.
 
 
 20
 "Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." (42 U.S.C. Sec. 1857h-5(b)(2) (1973 Supp.)).
 
 
 21
 Having submitted an approved plan, the state, with a single exception, is barred from modifying the provisions of its plan. The exception is found in Section 1857c-5(f)(1), wherein it is provided:
 
 
 22
 "Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicablity of such requirement to such source (or class) for not more than one year."
 
 
 23
 Once a plan is approved, the state may enforce the provisions of its plan against its citizens in its own courts. 42 U.S.C. Sec. 1857c-9(b)(1) (1973 Supp.). However, it is important to note that such an undertaking on the part of the state does not detract from the Administrator's primary ability to enforce federally the provisions of every state plan against citizens of that state which drew the plan. 42 U.S.C. Secs. 1857c-8 & 1857c-9(b)(2) (1973 Supp.).[2]
 
 
 24
 On April 30, 1971, national ambient air quality standards for six pollutants were promulgated by the Administrator. 35 Fed.Reg. 8186, et seq. On August 14, 1971, the Administrator promulgated implementation plan guidelines which he had earlier proposed. 36 Fed.Reg. 15486, et seq. Under those guidelines adopted state plans were to be submitted to the Administrator by January 31, 1972.
 
 
 25
 Four months later, on May 31, 1972, the Administrator published his approvals and disapprovals of 55 state implementation plans. 37 Fed.Reg. 10842, et seq. The Administrator took no comments from interested parties, and permitted no public participation in the decision to approve or disapprove the plans.
 
 
 26
 On June 23d and June 26, 1972, within thirty days of the Administrator's approval and disapproval of the various state plans, the petitioners filed their petitions for review, pursuant to 42 U.S.C. Sec. 1857h-5(b)(1) (1973 Supp.). They allege that the plans, as approved by the Administrator, would require eventually that most of the petitioners' generating plants be shut down and would require the cessation of new plant construction. Specifically, they allege that there is presently no technologically feasible method of removing from their coal-burning emissions an amount of sulfur sufficient to meet the standards, and that they cannot switch to "clean fuels", such as natural gas, because such resources are now unavailable.
 
 
 27
 While the main concern of the petitioners is that these impossibility-claims should be taken into account by the Administrator in approving state plans, they also attack and seek to set aside the Administrator's approval of the Ohio and Kentucky plans on two additional levels: (1) that he did not permit participation of interested parties prior to approval of the state plans; and (2) that he did not file an Environmental Impact Statement.
 
 
 28
 The Agency defends the actions of the Administrator on three alternative grounds. It asserts that individual claims of impossibility are irrelevant under the Clean Air Act Amendments of 1970. It asserts that even if such claims are relevant, the petitioners have already had an opportunity to present such claims at the state level, in state hearings, and that it is unnecessary to permit duplication at the federal level. Finally, it asserts that even if the claims are relevant and the state hearings are insufficient, the Clean Air Act Amendments of 1970 provide no point in the development of an approved pollutionabatement plan at which such claims may be presented.
 
 
 29
 IS CLAIM OF IMPOSSIBILITY OF COMPLIANCE RELEVANT UNDER THE ACT?
 
 
 30
 The Agency's position that claims of individual impossibility of compliance are irrelevant under the Act is based upon two statements found in the legislative history of the 1970 Amendments.
 
 
 31
 Legislative history is useful as an aid in the construction of an ambiguous statute, but care must be taken that it not be permitted to serve unreasonable ends. It is of little value where it contains conflicting reports of committees.
 
 The report on the Senate Bill stated:
 
 32
 ". . . [T]he health of people is more important than the question of whether the early achievement of air quality standards protective of health is technically feasible . . . . Therefore the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down." (S.Rept.No.91-1196, 91st Cong., 2d Sess., pp. 2-3 (1970)).
 
 Senator Edmund Muskie stated:
 
 33
 "Predictions of technological infeasibility were not considered sufficient reasons to compromise the public health." (116 Cong.Rec. (daily ed.) S.20598, Dec. 18, 1970).
 
 
 34
 No such language is contained in the Act, but if such language is given effect the electric utilities plants in Ohio and Kentucky would be closed down and possibly those throughout the United States. If Congress intended such a far-reaching result in the 1970 Amendments to the Act, it certainly would have mentioned such an intention in the body of Amendments.
 
 
 35
 However, the Senate Report and the statement of the Senator are, in fact, contradicted on several levels. First, it must be noted that although the legislative history cited above is from the Senate, the House Bill on amending the Clean Air Act was passed in lieu of the Senate Bill. See 3 U.S.Code Cong. and Admin.News, 91st Cong., 2d Sess., p. 5356 (1970). Moreover, in the legislative history from the House we find the following statements:
 
 
 36
 "Whenever the Secretary finds that as a result of the failure of a State to enforce the plan applicable to such State, any ambient air quality standard is not met, the Secretary is directed to notify the affected State or States, persons not in compliance with the plan and other interested parties. If the failure of the State to take action extends beyond the 30 days after the Secretary's notification, the Secretary may request the Attorney General to bring a suit on behalf of the United States in the appropriate U.S. district court to secure abatement of the pollution. The court may enter such judgment and orders as it deems necessary in the public interest and the equities of the case. In so doing the court must give due consideration to the practicability and to the technological and economic feasibility of complying with the provisions of the plan." (Emphasis added). (H.R. Rep.No.91-1146, 91st Cong., 2d Sess. (1970); 3 U.S.Code Cong. & Admin. News 5364 (1970)).
 
 
 37
 Second, in the implementation plan guidelines issued by the Administrator to aid the states in formulating pollution-abatement plans, specific recognition is given to cost-effectiveness and resource availability. The guidelines state:
 
 
 38
 "Nothing in this part shall be construed in any manner:
 
 
 
 * * *
 (b) To encourage a State to adopt any particular control strategy[3] without taking into consideration the cost-effectiveness of such control strategy in relation to that of alternative control strategies.
 
 
 
 39
 * * *
 
 
 40
 (d) To encourage a State to prepare, adopt, or submit a plan without taking into consideration the social and economic impact of the control strategy set forth in such plan, including, but not limited to, impact on availability of fuel, energy, transportation, and employment." (40 C.F.R. Sec. 51.2 (1972)).
 
 
 41
 We find the Agency's argument that technological infeasibility, high cost-benefit, and resource unavailability are irrelevant under the 1970 Amendments, devoid of merit.
 
 THE STATE PROCEEDINGS
 
 42
 The Agency and the Intervenor argue that the question of when the petitioners will have an opportunity to present their claims at the federal level is irrelevant, since the petitioners have had or will have opportunities to present such claims at the state level at the hearing prior to the adoption of the plan, or at such time as the Governor may apply for an extension of time on behalf of the petitioners, or at the state enforcement proceedings against the petitioners.
 
 
 43
 We cannot accept this argument except as to state enforcement proceedings. Regardless of what has happened or what will occur at the state level before state administrators, the simple fact is that the plans of Ohio and Kentucky, as they now stand, are subject to federal enforcement. In other words, even though the states may choose to exempt the petitioners in some manner or make accommodations to their predicament, the federal government can still enforce the existing plan in federal courts. 42 U.S.C. Secs. 1857c-8, 1857c-9(b)(2) (1973 Supp.).
 
 
 44
 Such a result is not idle speculation. In Getty Oil Co. (Eastern Operations) v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S. Ct. 937, 35 L.Ed.2d 256 (1973), the background events of the case were explained as follows:
 
 
 45
 "On December 29, 1971, Getty instituted an action in the Delaware Chancery Court seeking a temporary restraining order against enforcement of the challenged regulation by the state Secretary pending disposition of Getty's appeal to the Delaware Water and Air Resources Commission. The restraining order was granted on December 30, 1971." (467 F.2d at 354).
 
 
 46
 Shortly after this state court injunction was issued, the Administrator of the EPA sent a letter informing the parties that violations of the existing Delaware plan were occurring. Approximately thirty days thereafter an order was issued by the Administrator against violations of the plan, pursuant to 42 U.S.C. Sec. 1857c-8(a)(1) (1973 Supp.). Getty was then forced to seek remedies in the federal court notwithstanding the state court injunction on enforcement at the state level.
 
 
 47
 The additional state remedy found in 42 U.S.C. Sec. 1857c-5(f) (1973 Supp.) is in reality no remedy at all. This section provides:
 
 
 48
 "Prior to the date on which any stationary source or class of moving sources is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the applicability of such requirement to such source (or class) for not more than one year." (42 U.S.C. Sec. 1857c-5(f)(1)).
 
 
 49
 Not only is such a "remedy" limited to a one-year extension of time for compliance, but it is within the sole discretion of the Governor to apply for such extension and it is within the sole discretion of the Administrator to approve it. This is hardly a substitute for a mandatory federal consideration of the petitioners' claims of high cost-benefit, technological infeasibility, and resource unavailability.
 
 THE PROCEDURAL REQUIREMENTS
 
 50
 Having determined that the claims of the petitioners are relevant under the Clean Air Act Amendments of 1970, and having determined that state procedures were inadequate to protect the interests of the petitioners, the core question in this action remains: At what stage and in what manner are the petitioners' claims to be considered?
 
 
 51
 The EPA, as an agency of the United States Government, is subject to the provisions of the Administrative Procedure Act (APA, 5 U.S.C. Sec. 500 et seq. (1967)). Section 551 of the APA provides that for the purposes of the Act-
 
 
 52
 ". . . "[A]gency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . . ."
 
 
 53
 The APA establishes procedural requirements for three occasionally overlapping administrative functions: individual adjudication,[4] adjudicatory-type rulemaking, and informal rulemaking. 5 U.S.C. Secs. 553, 554 (1967).
 
 
 54
 The petitioners first assert that the action of the Administrator in approving or disapproving the submitted state plans constituted, at the minimum, informal rulemaking. Therefore, they assert, since he did not comply with the requirement of the APA that he permit participation and accept data and other comments from interested parties, his approval of the plan should be vacated and the case remanded with instructions to comply with the APA. We agree.
 
 Section 553 of the APA provides in part:
 
 55
 "Rule making
 
 
 
 * * *
 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." (5 U.S.C. Sec. 553 (1967)).
 Thus, as a general proposition, administrative rulemaking must permit some public participation in the decision-making, and, in a generalized way, it must articulate its bases and purposes.
 The Supreme Court, in Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), explained why these basic requirements for administrative rulemaking are necessary, stating that without permitting public participation and without developing the record, the administrative agencies would nullify the federal courts' function of administrative review. The Court stated:
 "Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. Sec. 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Jaffe, supra, at 182. See McBee v. Bomar, 296 F.2d 235, 237 (CA6 1961); In re Josephson, 218 F.2d 174, 182 (CA1 1954); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968). See also Wong Wing Hang v. Immigration and Naturalization Serv., 360 F.2d 715, 719 (CA2 1966). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." (Emphasis added). (401 U.S. at 416, 91 S.Ct. at 824).
 Similar and closer to the point in this case are the remarks of the Court in Environmental Defense Fund, Inc. v. Environmental Protection Agency, 150 U.S. App.D.C. 348, 465 F.2d 528, 540-541 (1972), wherein the Court had this to say about actions of the Administrator of the EPA:
 "We recognize that EPA's functions are difficult and demanding and are impressed by the thoughtfulness and range of EPA's general approach; nor have we any reason to doubt the wisdom and validity of its specific decisions. But the demand of functions so difficult of decision are accompanied by demands, equally difficult to meet, for attentive consideration and careful exposition. Our own responsibility as a court is as a partner in the overall administrative process-acting with restraint, but providing supervision. We cannot discharge our role adequately unless we hold EPA to a high standard of articulation. Kennecott Copper Corp. v. EPA, 149 U.S. App.D.C. 231, 462 F.2d 846 (1972)."
 It has been recognized consistently that without informed judicial review of agency actions, ". . . expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion." New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (1951) (dissenting opinion), quoted in Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 The Administrator built no record in approving or disapproving the state plans. He took no comments, data, or other evidence from interested parties, nor did he articulate the basis for his actions. This failure contravenes the explicit dictates of Section 553 of the APA and renders meaningless the judicial review provisions of Section 706.
 The approval of the Ohio and Kentucky plans by the Administrator pursuant to 42 U.S.C. Sec. 1857-5(a)(2) (1973 Supp.) must therefore be deferred until such time as the Administrator complies with Section 553 of the APA. The petitioners may, subsequent thereto, attack the actions of the Administrator on the grounds that there was a "clear error of judgment." Citizens To Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. 814.
 However, as heretofore noted, the petitioners herein do not simply request a remand with instructions to adhere to the informal rulemaking dictates of Section 553 of the APA; they also request a full-scale evidentiary hearing before the Administrator to adjudicate their complex and intricate claims of high cost-benefit, technological infeasibility and resource unavailability. We cannot accept this position.
 Administrative rulemaking which is to be preceded by extensive hearings where "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts . . ." (5 U.S.C. Sec. 556(d) (1967)) is required only when the last sentence of Section 553(c) of the APA applies. This section provides:
 "When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection." (Emphasis added). (5 U.S.C. Sec. 553(c) (1967)).
 (Sections 556 and 557 of the APA outline the requirements for extensive, adjudicatory-type hearings.)
 Thus, when a statutory provision directing certain agency action states that such action shall be "made on the record after opportunity for an agency hearing," then, and only then, is the agency required to have full-scale adjudicatory hearings prior to rulemaking.
 The Supreme Court has recently considered an argument that an adjudicatory-type rulemaking requirement should apply to agency action even though this type of hearing was not specified in the statute empowering agency action. In United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756-757, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972), a unanimous Court stated:
 "Appellees claim that the Commission's procedure here departed from the provisions of 5 U.S.C. Secs. 556 and 557 of the Act. Those sections, however, govern a rulemaking proceeding only when 5 U.S.C. Sec. 553 so requires. The latter section, dealing generally with rulemaking, makes applicable the provisions of Secs. 556 and 557 only '[w]hen rules are required by statute to be made on the record after opportunity for an agency hearing . . . .' The Esch Act, authorizing the Commission 'after hearing, on a complaint or upon its own initiative without complaint, [to] establish reasonable rules, regulations, and practices with respect to car service . . .,' 49 U.S.C. Sec. 1(14)(a), does not require that such rules 'be made on the record.' 5 U.S.C. Sec. 553. That distinction is determinative for this case. 'A good deal of significance lies in the fact that some statutes do expressly require determinations on the record.' 2 K. Davis, Administrative Law Treatise Sec. 13.08, p. 225 (1958). Sections 556 and 557 need be applied 'only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be "on the record."' Siegel v. Atomic Energy Comm'n, 130 U.S.App.D.C. 307, 400 F.2d 778, 785 (1968); Joseph E. Seagram & Sons Inc. v. Dillon, 120 U.S. App.D.C. 112, 344 F.2d 497, 500 n. 9 (1965). Cf. First National Bank v. First Federal Savings & Loan Assn., 96 U.S.App.D.C. 194, 225 F.2d 33 (1955)."
 See also, International Harvester Co. v. Ruckelshaus, 478 F.2d 615, at 629 (D.C. Cir.1973), decided Feb. 10, 1973.
 There is no provision that, in approving or disapproving proposed state pollution-abatement plans pursuant to 42 U.S.C. Sec. 1857c-5(a)(2) (1973 Supp.), the Administrator shall make a determination "on the record after an opportunity for an agency hearing." Furthermore, when Congress intended that actions of the Administrator of the EPA be preceded by adjudicatory-type hearings it either specifically outlined the type of hearings, (42 U.S.C. Sec. 1857f-5a(c)(1) (1973 Supp.)), or invoked the determination "on the record" provision of 5 U.S.C. Sec. 553(c) (1967). See 42 U.S.C. Sec. 1857c-5(f)(2) (1973 Supp.); 42 U.S.C. Sec. 1857f-5(b)(2)(B) (1973 Supp.).[5] On these grounds alone we would reject the petitioners' argument that the Administrator is required to have full-scale adjudicatory-type hearings prior to acceptance of the state plans.
 There is, however, an additional reason why adjudicatory-type hearings cannot be required of the Administrator prior to approval of state plans. Section 1857c-5(a)(2) provides that within four months of submission of the state plans, the Administrator is required to take final action on all of them. It can hardly be expected that extensive hearings (as outlined in Sections 556 and 557 of the APA) on more than fifty state plans, affecting virtually every pollutant source in the United States, could be held and acted upon rationally within a four months' period.
 There remains, of course, an important question: If the petitioners are not entitled to raise their claims of high cost-benefit, technological infeasibility and resource unavailability prior to the Administrator's approval of the state plans, at what point can these claims be asserted?
 The answer is found in 5 U.S.C. Sec. 703 (1967), which provides in part:
 "Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."
 Since we have determined that there could not have been an adequate hearing on individual claims such as those presented by the petitioners herein prior to approval of the state plans, the claims can be asserted as a defense in either federal or state enforcement proceedings.
 We are cognizant of the language of 42 U.S.C. Sec. 1857h-5(b)(1) and (2) (1973 Supp.), which provides:
 "A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c-5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate . . . .
 "(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."
 However, having determined that review of the petitioners' claims could not have been obtained under the provisions of paragraph (1) of that section (the approval of state plans), the preclusion of subsection (2) is simply inapposite.
 THE ENVIRONMENTAL IMPACT STATEMENT
 The petitioners contend that the Administrator's approval of the state plans should be held in abeyance until such time as the Administrator files an Environmental Impact Statement pursuant to the National Environmental Policy Act. 42 U.S.C. Secs. 4321 to 4347 (1973 Supp.).
 Essentially, acceptance of this argument would mean that an agency whose sole purpose is the improvement of the environment, would have to file an Environment Impact Statement with itself. See Reorganization Plan No. 3 of 1970, 84 Stat. 2086. We are in accord with the Third, Fourth and D.C. Circuit holdings that such action on the part of the Administrator is unnecessary. Appalachian Power Co. v. Ruckelshaus, 477 F.2d 495 (4th Cir.1973), No. 72-1733, decided April 11, 1973; International Harvester Co. v. Ruckelshaus, 478 F.2d 615 (D.C.Cir.1973) decided February 10, 1973; Getty Oil Co. (Eastern Operations) v. Ruckelshaus, 467 F.2d 349 (3rd Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).
 The approval of the state plans by the Administrator is hereby vacated, and the case is remanded to the Agency for compliance with Section 553 of the APA, as articulated in this opinion.
 
 
 [1]
 Primary ambient air quality standards were defined as standards which "are requisite to protect the public health." Secondary ambient air quality standards were defined as standards which are "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." 42 U.S.C. Sec. 1857c-4(b) 1 and 2 (1973 Supp.)
 
 
 [2]
 It would seem to us that the court which first acquired jurisdiction of enforcement proceedings would have exclusive jurisdiction to proceed to determine the litigation, and its judgment would be res judicata of the issues litigated. In view of the fact that both federal and state courts acquire jurisdiction by a single Act of Congress, we do not think that Congress ever intended that the parties defendant to enforcement proceedings would be subject to double penalties, i. e., penalties in each jurisdiction
 
 
 [3]
 "Control strategy" is defined in the guidelines as "a combination of measures designated [designed?] to achieve the aggregate reduction of emissions necessary for attainment and maintenance of a national standard . . . ." (40 C.F.R. Sec. 51.1 (n) (1972))
 
 
 [4]
 The distinction between individual adjudication and relemaking can become blurred in borderline cases. Administrative adjudication is concerned with the determination of past and present rights and liabilities of parties. Rulemaking, on the other hand, involves the prescription of law to effect broad policy considerations. See American Airlines Co. v. Civil Aeronautics Bd., 123 U.S.App.D.C. 310, 359 F.2d 624, 629 (1966). While rulemaking always affects individual rights and liabilities in some measure, a line must be drawn at some point. We have no difficulty in finding that the approval of state plans falls on the rulemaking side of the line even though individual rights will at some time in the future be affected. A contrary finding would mean that every pollutant source in the United States would have to be granted an individual hearing within a four-month period. (This point is discussed subsequently in the body of this opinion.)
 
 
 [5]
 In Appalachian Power Co. v. Ruckelshaus, 477 F.2d 495 (4th Cir. 1973), No. 72-1733, decided April 11, 1973, the Court held that the petitioners therein could, at a future date, require the Administrator "to take additional testimony as authorized under Section 1857h-5(c)" on their individual attacks relative to the Administrator's approval of three state plans. Slip Opinion at p. 28. We disagree with this holding to the extent that it requires extensive adjudicatory-type hearings prior to approval of state plans
 Section 1857h-5(c) provides in part:
 "In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to the court may deem proper." (Emphasis added).
 Since there is no provision that in approving or disapproving state plans pursuant to 42 U.S.C. Sec. 1857c-5(a)(2) (1973 Supp.) the Administrator shall make a determination "on the record after notice and opportunity for hearing", the section is inapplicable by its own terms.