572 F.2d 1143
 11 ERC 1411, 8 Envtl. L. Rep. 20,213
 NORTHERN OHIO LUNG ASSOCIATION and Patricia Smith, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Russell Train,
Administrator, Respondent.
OHIO EDISON COMPANY, Buckeye Power, Inc., and Ohio Power
Company, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Russell E. Train,
Administrator, Respondents.
The TOLEDO EDISON COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Russell E. Train,
Administrator, Respondent.
The CLEVELAND ELECTRIC ILLUMINATING COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Russell E. Train,
Administrator, Respondent.
 Nos. 76-2369, 76-2375, 76-2407 and 76-2408.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 13, 1977.
Decided Feb. 2, 1978.
 
 Michael L. Hardy, James M. Friedman, Guren, Merritt, Sogg & Cohen, Cleveland, Ohio, Donald H. Hauser, The Cleveland Elec. Illuminating Co., Cleveland, Ohio, for Cleveland Elec. Illuminating Co.
 A. Mark Segreti, Jr., Segreti & Tousey, Columbus, Ohio, for Northern Ohio Lung Ass'n.
 Wilson W. Snyder, Louis E. Tosi, Samuel M. Allen, Fuller, Henry, Hodge & Snyder, C. Randolph Light, Fred J. Lange, Jr., Michael L. Hardy, Toledo, Ohio, for Ohio Edison Co. and Toledo Edison Co.
 Lloyd S. Guerci, Peter R. Taft, Alfred T. Ghiorzi, Dept. of Justice, Ronald C. Hausmann, office of Gen. Counsel, E. P. A., Washington, D. C., for respondent.
 Before PHILLIPS, Chief Judge, ENGEL, Circuit Judge, and FREEMAN, Senior District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 The several petitions for review considered here challenge approval by the United States Environmental Protection Agency of an April 15, 1977 attainment date for meeting standards for the emission of particulate matter. The State of Ohio established the attainment date in question through a revision to its State Implementation Plan (SIP) filed under the Clean Air Act, 42 U.S.C. § 7401 et seq.[1] The petitioning utilities challenge the attainment date because, they claim, compliance by May 15, 1977 was impossible or infeasible and the requirement was therefore arbitrary and capricious. On the other hand, the petitioning environmental group, Northern Ohio Lung Association (NOLA) asserts that the EPA Administrator was without any authority to revise the attainment date beyond May 31, 1975, a date which it claims is a mandatory deadline of the statute. We uphold the approval by the Administrator and deny the petitions.
 
 
 2
 The dispute here is the latest chapter in efforts by Ohio to implement emissions limitations which meet national primary ambient air quality standards for certain pollutants characteristically contained in the emissions of electrical utility companies. The early history of the Ohio implementation plan is contained in our opinion in Buckeye Power, Inc. v. EPA, 481 F.2d 162 (6th Cir. 1973) (Buckeye I ):
 
 
 3
 On April 30, 1971, national ambient air quality standards for six pollutants were promulgated by the Administrator. 35 Fed.Reg. 8186, et seq. On August 14, 1971, the Administrator promulgated implementation plan guidelines which he had earlier proposed. 36 Fed.Reg. 15486, et seq. Under those guidelines adopted state plans were to be submitted to the Administrator by January 31, 1972.
 
 
 4
 Four months later, on May 31, 1972, the Administrator published his approvals and disapprovals of 55 state implementation plans. 37 Fed.Reg. 10842, et seq. The Administrator took no comments from interested parties, and permitted no public participation in the decision to approve or disapprove the plans.
 
 
 5
 481 F.2d at 167.
 
 
 6
 In Buckeye I, our court vacated the Administrator's approval of the Ohio SIP because of EPA's failure to follow the procedural requirements of the Administrative Procedure Act, particularly 5 U.S.C. § 553 (1970), requiring an agency to give interested parties an opportunity to participate in administrative rulemaking by submitting written data, views, or arguments.
 
 
 7
 On April 15, 1974, after satisfying the procedural objections of Buckeye I, the Administrator reapproved, with specific exceptions,[2] the Ohio SIP, which at that time contained an attainment date of July 1, 1975. 39 Fed.Reg. 13539 (April 15, 1974). The SIP included a strategy for controlling particulate emissions. In May, 1974, the utilities again sought review of the Administrator's approval of the Ohio SIP and in Buckeye Power, Inc. v. EPA, 525 F.2d 80 (6th Cir. 1975) (Buckeye II ), we determined that the utility petitions were not ripe for review since the SIP as administered might accommodate the complaints of the utilities. Id. at 82-84.
 
 
 8
 While the utilities' petitions were under consideration in this court the Director of the Ohio EPA determined that the July 1, 1975 date represented a "physically impossible" goal for the attainment of the national ambient air quality standard governing particulate emissions.[3] Consequently, the Director revised the date under the Ohio plan to April 15, 1977 for compliance with particulate emissions limitations. In January, 1976, the Administrator published his proposed approval of the revised attainment date for particulate emissions. 41 Fed.Reg. 2099 (January 14, 1976). The Administrator's final approval, 41 Fed.Reg. 41691 (September 23, 1976),[4] is the subject of the petitions for review now before the court.[5]
 
 
 9
 The Northern Ohio Lung Association urges that neither the Ohio EPA nor the Administrator had authority to extend the date for compliance with the SIP beyond the original July 1, 1975 date. NOLA asks us to vacate the Administrator's approval of the April 15, 1977 date, reinstating the earlier 1975 attainment date.
 
 
 10
 On the other hand, the utilities claim that the Administrator abused his discretion by accepting the change to April, 1977, basically because that date was not feasible. They do not question the Administrator's decision to vacate the July 1, 1975 deadline, but instead would leave the Ohio SIP without any effective attainment date, at least until a reasonable and realistic date can be established a determination which they urge cannot be made until final standards have been promulgated nor only for the emissions of particulates, but also for the control of sulfur dioxide emissions.[6]
 
 
 11
 The dilemma which faces the utility companies, according to them, is in the interrelationship of emissions control for particulate matter and sulfur dioxide. The utilities claim that it is impractical to install devices which comply with the particulate matter regulations without also being able to determine how much sulfur dioxide they may legally emit through their stacks. The utilities presented evidence to support this claim of interdependence before both the state and federal Environmental Protection Agencies.[7]THE MOOTNESS ISSUE
 
 
 12
 The EPA contends that the controversy with NOLA is moot because both the original July 1, 1975 date advocated as proper by NOLA and the revised April 15, 1977 date approved by the EPA have passed. We cannot agree.
 
 
 13
 In Big Rivers Electric Corp. v. EPA, 523 F.2d 16 (6th Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), it was unsuccessfully claimed that the utilities' challenge to the validity of a regulation was moot because that regulation was no longer in force. There the Court stressed the "subsisting controversy between the petitioners and EPA over the authority of the Administrator of that agency," 523 F.2d at 19.
 
 
 14
 Here too a subsisting controversy exists between EPA and NOLA, which continues to contest the Administrator's authority notwithstanding the expiration of the original and revised attainment dates. Because we find no meaningful distinction between this case and Big Rivers, we hold that NOLA's petition represents a justiciable controversy.
 
 THE UTILITIES' PETITIONS
 
 15
 The short and simple answer to the utilities' petitions is that their arguments are fully foreclosed by the decision of the United States Supreme Court in Union Electric Co. v. EPA, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). Union Electric examined the structure of Section 110 of the Act, 42 U.S.C. § 7410, to determine what criteria were appropriate for the Administrator to consider in deciding whether to approve or disapprove an SIP. The Court there noted that the states are accorded a wide discretion in formulating individual state plans. 427 U.S. at 250-56, 96 S.Ct. 2518; Train v. Natural Resources Defense Council, 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Union Electric stresses that in evaluating a proposed SIP, the Administrator is confined to the eight[8] criteria set forth in Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), and may not concern himself with factors other than those specifically enumerated therein. In Union Electric, as here, the issue was whether the Administrator could disapprove an SIP on the ground of technological infeasibility. The Court concluded that "if a basis is to be found for allowing the Administrator to consider (claims of technological or economic infeasibility), it must be among the eight criteria . . . ." Union Electric Co. v. EPA, supra, 427 U.S. at 257, 96 S.Ct. at 2525. In short, the Court made clear that the Administrator is circumscribed in the factors which he may consider and it follows perforce that in our own review, we may only consider on petition for review those claims which the Administrator himself could properly have considered in determining whether to approve or disapprove a given SIP, Union Electric Co. v. EPA, supra, 427 U.S. at 256, 96 S.Ct. 2518. The same criteria of Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), guide the Administrator in determining whether to approve revisions to an SIP proposed by a state. Section 110(a)(3)(A) of the Act, 42 U.S.C. § 7410(a)(3) (A); Train v. NRDC, supra, 421 U.S. at 79-80, 95 S.Ct. 1470. No showing is made by the utilities that the alleged interrelationship of emission control of sulfur dioxide and particulate matter comes within any of the criteria of the Act which the Administrator is authorized to consider. It is apparent to us that the sole issue raised is precisely that which was rejected in Union Electric.[9]
 
 NORTHERN OHIO LUNG ASSOCIATION'S PETITION
 
 16
 In contrast to the utilities' petitions, that of the Northern Ohio Lung Association at least arguably comes within one of the criteria enumerated in Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2):
 
 
 17
 (A) . . . (i) in the case of a plan implementing a national primary ambient air quality standard, (the SIP) provides for the attainment of such primary standard as expeditiously as practicable but . . . in no case later than three years from the date of approval of such plan . . . .
 
 
 18
 NOLA's argument is essentially that Congress set specific deadlines for action under the Clean Air Act and that mid-1975 was the contemplated date for attainment of national primary ambient air quality standards implemented by the states and approved by the Administrator.[10]
 
 
 19
 It is not for us to determine in the first instance whether the Ohio SIP meets all the criteria of the statute. That responsibility rests with the Administrator. Our review is confined to determining whether the Administrator erred in determining that the revised date was timely and satisfied Section 110(a)(2)(A) of the Act. 42 U.S.C. § 7410(a)(2)(A).
 
 
 20
 As noted previously, our circuit is of the view that the Administrator's approval of an SIP constitutes rulemaking under the Administrative Procedure Act. Buckeye I, 481 F.2d at 170-71. Buckeye I also identified the standard which guides our court in reviewing the Administrator's approval of an SIP.
 
 
 21
 "Scrutiny of the facts does not end, however, with the determination that the (administrative officer) has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) ((1970)). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . .
 
 
 22
 . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." (emphasis in original)
 
 
 23
 481 F.2d at 171, quoting Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 24
 We conclude first that the Administrator considered the relevant facts in approving the revised attainment date. After receiving public comments, he specifically determined that, with respect to particulate matter, attainment on April 15, 1977 would be as expeditious as practicable and would be within three years of the plan's approval. 41 Fed.Reg. 41691 (September 23, 1976). Second, in view of the record before the Administrator, we are not convinced that he has made a clear error in judgment in approving the revised date. Considering the limited role of review in the administrative rulemaking context, we conclude therefore that the Administrator's action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 25
 Contrary to the claim of petitioner NOLA, the statutory scheme governing SIPs does not fix a calendar date for attainment. On the other hand, Congress did employ calendar dates for the attainment of automobile emissions standards.[11] Therefore, Congress' failure to set a similar calendar date impresses us with its intention that the language, "three years from the date of approval," should have a more flexible meaning.
 
 
 26
 It is true, of course, that an earlier SIP had been proposed by Ohio and in turn approved by the Administrator. Nonetheless, in view of our holding in Buckeye I vacating the Administrator's approval because an adequate hearing had not been provided, we believe it inevitably follows that the earlier date cannot inflexibly set the maximum period by which the three year attainment period can be limited. We have no doubt that the Congress actually expected an earlier attainment date in the normal course of events, but that fact is not sufficient to persuade us to depart from the plain language of the statute.
 
 
 27
 We thus do not read the statutory scheme to create a sudden death deadline for attainment. The Act recognizes that, as long as an SIP continues to satisfy the requirements of Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), a state may revise any aspect of its plan, including the date of attainment. Train v. NRDC, supra, 421 U.S. at 80, 95 S.Ct. 1470.
 
 
 28
 In addition to its claim that the Administrator was without power to approve a revision of the attainment date beyond mid-1975, NOLA urges that attainment of the primary ambient air standards for particulate matter was in fact "practicable" within the meaning of the Act because certain power companies in Ohio were shown to have been capable of compliance.
 
 
 29
 While the fact that some stationary sources in Ohio would be able under their particular circumstances to achieve an earlier attainment date would be relevant to the Administrator's consideration of the issue, he was entitled in his discretion to take into account the overall realities existing in Ohio in determining whether attainment would be practicable prior to the expiration of the three year period measured from the date of his approval. By reviewing the data presented for his consideration and clearly articulating his conclusion, the Administrator acted within the scope of his discretion. Further evidence of the Administrator's care in making his determination is the fact that while specifically approving the extended attainment date for standards relating to particulate matter, he rejected similar requests as they pertained to other pollutants.[12] Moreover, at least in the Administrator's view, the "expeditiously as practicable" standard requires compliance before the April 15, 1977 attainment date for those sources capable of earlier compliance. 41 Fed.Reg. 41691 (September 23, 1976).
 
 
 30
 Because we conclude that the Administrator acted within the scope of his authority in approving the revised attainment date for particulate matter, we deny the petitions for review considered herein.
 
 
 
 *
 Honorable Ralph M. Freeman, Senior District Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Following the Clean Air Act Amendments of 1977, Pub.L.No.95-95, 91 Stat. 685 et seq. (1977), the provisions of the Clean Air Act were transferred from 42 U.S.C. § 1857 et seq. to 42 U.S.C. § 7401 et seq
 
 
 [2]
 One specific exception was the Administrator's disapproval of the plan to the extent that it contained no control strategy for sulfur oxides, including sulfur dioxide. 40 C.F.R. § 52.1881. The sulfur oxides control strategy had been removed from the SIP by the Governor of Ohio, 39 Fed.Reg. 13540 (April 15, 1974)
 Acting upon the authority of Section 110(c)(1)(A) of the Act, 42 U.S.C. § 7410(c)(1)(A), the Administrator took the initiative to promulgate an emission control strategy for sulfur dioxide, issuing a regulation which is currently the subject of other petitions for review in this court. 41 Fed.Reg. 36324 (August 27, 1976). After our circuit, on November 12, 1976, stayed enforcement of the regulation and ordered the EPA to reopen the administrative record to allow further comment, Cincinnati Gas & Elec. Co., et al. v. EPA, No. 76-2090, the EPA issued a revised plan with a promulgation date of June 17, 1977 and an attainment date of June 17, 1980. 42 Fed.Reg. 27588 (May 31, 1977). The Administrator's most recent sulfur dioxide regulation is now also the subject of petitions for review now pending in this court, Cincinnati Gas & Elec. Co., et al. v. EPA, No. 77-1367.
 
 
 [3]
 At the time of the Director's decision our circuit had followed the view that technological impossibility would be a basis for vacating an approval of an SIP by the EPA, Buckeye I, 481 F.2d at 168-69, a view which was expressly disapproved by the Supreme Court in Union Elec. Co. v. EPA, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), declaring that impossibility was not among the criteria that either the Administrator of the EPA or a court of appeals could consider in reviewing an SIP
 
 
 [4]
 Ohio had also sought to revise the attainment date for carbon monoxide, hydrocarbon, photochemical oxidant and nitrogen oxide emissions. The Administrator approved the revision only as to particulate matter. 41 Fed.Reg. 41691 (September 23, 1976)
 Under the Clean Air Act, the Administrator "shall approve" a revision to an SIP if the plan, inter alia, provides for the attainment of national primary ambient air quality standards "as expeditiously as practicable." Section 110(a)(2)(A), (a)(3) of the Act; 42 U.S.C. § 7410(a)(2)(A), (a)(3). After considering public comments, the Administrator determined that April 15, 1977 had not been shown to be the most expeditious date for attainment with respect to carbon monoxide, hydrocarbons, photochemical oxidants and nitrogen oxides and hence disapproved the proposed revision of the attainment date for those emissions. 41 Fed.Reg. 41691-92.
 
 
 [5]
 While the emission standards themselves are also the subject of challenge, the petitions immediately on review challenge only the attainment date
 
 
 [6]
 The Ohio SIP, as promulgated by the Ohio EPA, failed to provide for the regulation of sulfur oxides, although during the pendency of these petitions the Administrator promulgated a regulation applicable to Ohio. See note 2 supra
 
 
 [7]
 The written statement of Robert Fortman, an environmental consultant, is typical of the utilities' evidence submitted to the state and federal agencies:
 In planning compliance with air pollution control regulations, an electric utility must take into consideration both particulate matter and sulfur dioxide requirements of this regulation. An electric utility could upgrade their present precipitators to meet the more stringent particulate matter regulations while burning a high sulfur coal. Subsequently, this utility may discover a source of low sulfur fuel that they could use to meet new sulfur dioxide regulations. However, this new fuel would cause the recently upgraded precipitator to no longer meet particulate matter emission regulations. The result would be an additional upgrading of the precipitator. On the other hand, if any of the sulfur dioxide removal devices being tested is eventually selected by a utility as its method of control of sulfur dioxide, this will also have an effect on the electrostatic precipitator. Some sulfur dioxide removal schemes require flue gases that are free of particulate matter, in which case the electrostatic precipitator upgraded for low sulfur fuel can still be used but it will be oversized. Other sulfur dioxide removal schemes remove particulate matter along with the sulfur dioxide using scrubbing methods. If a utility selected this scheme, an electrostatic precipitator would not be required. . . . (T)he electric utility industry cannot today select a process for controlling their sulfur dioxide emissions. This means that they also are unable to select the optimum means of controlling particulate emissions.
 
 
 [8]
 At the time of the Administrator's approval of the revised attainment date, September 23, 1976, the Clean Air Act enumerated eight criteria which an SIP had to meet to qualify for approval. The Clean Air Act Amendments of 1977 recently expanded the number of criteria to eleven. Pub.L. No. 95-95, § 108(b) (I)-(K), 91 Stat. 694 (1977)
 
 
 [9]
 Almost parenthetically, the Reply Brief of petitioner Cleveland Electric Illuminating Company urges that due process requires this court to consider its claims of technological infeasibility. See generally Union Electric Co. v. EPA, supra, 427 U.S. at 269 n. 19, 96 S.Ct. 2518. Whatever might be the ultimate vehicle for reaching this issue, we do not conceive it to be the petitions now before us, which contest only the revised attainment date and not the underlying emissions standard for particulate matter. We, therefore, decline to address the issue. See Ohio Environmental Council v. United States District Court, 565 F.2d 393, 397 (6th Cir. 1977)
 
 
 [10]
 NOLA conceives the attainment date to be the culmination of a series of discrete yet interrelated events. Section 109 of the Act, 42 U.S.C. § 7409, requires the publication of proposed national primary ambient air quality standards within thirty days after December 31, 1970. Ninety days after publishing the proposed standards, the Administrator was required to promulgate final standards (April 30, 1971)
 Under Section 110 of the Act, 42 U.S.C. § 7410, each state must submit an SIP to the Administrator within nine months after the promulgation of primary standards (January 31, 1972). Within four months of the submission, the Act requires the Administrator to approve or disapprove the plan (May 31, 1975) or, within six months, to promulgate plans for those states which have not submitted qualifying plans (July 31, 1972). Measuring three years from these dates, NOLA reasons that the latest permissible attainment dates under the Act are May 31, 1975 for approved SIPs, such as Ohio's, and July 31, 1975 for promulgated SIPs. In short, NOLA contends that primary standards must be attained nationwide no later than mid-1975.
 
 
 [11]
 Section 202 of the Act, 42 U.S.C. § 7521. The statute employs the concept of "model year," which is keyed to a manufacturer's annual production period. Section 202(b)(3)(A)(i) of the Act, 42 U.S.C. § 7521(b)(3)(A)(i)
 
 
 [12]
 See note 4 supra