525 F.2d 80
 8 ERC 1317, 5 Envtl. L. Rep. 20,701
 BUCKEYE POWER, INC., et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, and Russell E. Train,
Administrator of the Environmental Protection
Agency, Respondents,
State of Ohio, Intervenor.
REPUBLIC STEEL CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
Administrator, Environmental Protection Agency, Respondents,
State of Ohio, Intervenor.
YOUNGSTOWN SHEET AND TUBE COMPANY, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
Administrator, Environmental Protection Agency, Respondents,
State of Ohio, Intervenor.
UNITED STATES STEEL CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
Administrator, Environmental Protection Agency, Respondents,
State of Ohio, Intervenor.
 Nos. 74-1513, 74-1521, 74-1539 and 74-1540.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 16, 1975.
Decided Oct. 24, 1975.
 
 Leslie Henry, Wilson W. Snyder, Fuller, Henry, Hodge & Snyder, Thomas L. Young, Toledo, Ohio, for petitioners in No. 74-513.
 James C. Sennett, Jr., Jones, Day, Cockley & Reavis, Cleveland, Ohio, for petitioner in No. 74-1521.
 Norman S. Jeavons, Russell E. Leasure, Baker, Hostetler & Patterson, William W. Falsgraf, Cleveland, Ohio, for petitioner in No. 74-1539.
 J. Van Carson, Squire, Sanders & Dempsey, Cleveland, Ohio, for petitioner in No. 74-1540.
 Alan G. Kirk, II, Gen. Counsel E.P.A., Washington, D. C., Wallace H. Johnson, Edmund B. Clark, John E. Varnum, Dept. of Justice, Washington, D. C., Lloyd S. Guerci, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for respondents.
 Before PHILLIPS, Chief Judge, and EDWARDS and MILLER, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 In a consolidated hearing we consider four petitions from a number of Ohio steel mills and power companies to review the actions of the Environmental Protection Administrator Russell Train in approving Ohio's plan for improvement of the quality of the ambient air under the Clean Air Act Amendments of 1970, 42 U.S.C. §§ 1857-58 (1970). Ohio's regulations in this regard were adopted in 1972. These same petitioners have previously challenged the EPA's 1972 approval of the Ohio implementation plan. In Buckeye v. EPA (I), 481 F.2d 162 (6th Cir. 1973), this court held that EPA's approval of the Ohio plan was rulemaking under the Administrative Procedure Act, 5 U.S.C. § 706 (1970), and that its approval could not be valid without first giving the interested parties a chance to be heard. The opinion did not call for a full adjudicatory hearing, but did call for opportunity for the parties to submit statements and evidence to the Administrator after receipt of the proposed Ohio plan.
 
 
 2
 Subsequent to this court's decision in Buckeye (I), supra, rulemaking of the variety just described was undertaken by EPA and pursuant thereto the Administrator entered his order, dated April 12, 1974, approving the Ohio plan. This approval is again under attack in this case.
 
 
 3
 The petitioners in the instant proceeding have shifted ground from protesting denial of their right to be heard to attacking the substantive effect of the Administrator's approval.[1] They claim that the emission restrictions are "technically infeasible and unachievable within the prescribed period of time," and that the particulate control strategy is "excessively restrictive and unnecessary for attainment and maintenance of particulate ambient standards." Petitioners also claim that any control of particulates through "scrubbing" must as a matter of economic feasibility be designed and constructed in conjunction with means ultimately to be ordered for control of sulphur dioxides. Additionally, petitioners attack the nitrogen dioxide control strategy in the Ohio plan and the Administrator's approval of it.
 
 
 4
 However significant these issues may ultimately prove to be, we hold that the actual controversies in these petitions are not now ripe for judicial decision. See generally, K. Davis, Administrative Law Treaties § 21.00 (Supp.1970).
 
 
 5
 These petitions represent attacks upon the approval by the federal EPA Administrator of the Ohio implementation plan. But the federal approval was given under important exceptions, one of which eliminated any approval of any sulphur dioxide standard because Ohio had withdrawn that standard. Further, since the protested approval, the federal Administrator has concluded that Ohio's emission regulation should be revised to allow exceptions for emissions during start-ups, shutdowns, and malfunctions. More important, he has now declared that none of Ohio's air quality control regions should be classified higher than priority three, whereas eight of them were originally classified as priority one. The effect of this declaration is that the nitrogen dioxide emission standard in the Ohio implementation plan is presently inapplicable. Equally important, the federal Administrator has decided that the attainment date for the Ohio plan should be delayed until April of 1977.
 
 
 6
 The federal Administrator's pronouncements on these points are definite and apparently conclusive, since he indicates that he will make them all conditions for continued approval of the Ohio plan. All of these changes referred to are designed to meet objections pressed by petitioners in this instant action. But the record before us shows that these changes are still in process of being made and that the Ohio plan is in process of major revision. The explanation for this is probably found in the fact that the Ohio EPA has just completed extensive hearings upon the emission standards set in the original Ohio plan. On the basis of 7,000 pages of testimony, an Ohio Hearing Panel has published a 417 page report and recommended downward revisions or elimination of the disputed Ohio emission standards applicable to particulates, nitrogen oxide and sulphur dioxide. Moreover, we have been furnished with a consent order entered into between petitioner Youngstown Sheet and Tube and the Regional EPA Administrator (which we hereby accept for filing) showing a detailed plan agreed upon by the company and the EPA for bringing its operations into compliance as to particulate emissions.
 
 
 7
 Our conclusion is that the disputes which petitioners seek to have this court resolve are being worked out at the state agency level where the EPA statute, as construed by the Supreme Court, clearly contemplates they should be.
 
 
 8
 In a careful review of the history of the Clean Air Act Amendments of 1970, a nearly unanimous Supreme Court provided guidelines to its interpretation. The nature of the state plan and the federal Administrator's duty to approve were outlined as follows:
 
 
 9
 Within nine months after the Agency's promulgation of primary and secondary air quality standards, each of the 50 States was required to submit to the Agency a plan designed to implement and maintain such standards within its boundaries. § 110(a)(1) of the Clean Air Act, as added, 84 Stat. 1680, 42 U.S.C. § 1857c-5(a)(1). The Agency was in turn required to approve each State's plan within four months of the deadline for submission, if it had been adopted after public hearings and if it satisfied eight general conditions set forth in § 110(a)(2). Probably the principal of these conditions, and the heart of the 1970 Amendments, is that the plan provide for the attainment of the national primary ambient air quality standards in the particular State "as expeditiously as practicable but . . . in no case later than three years from the date of approval of such plan." § 110(a)(2)(A). In providing for such attainment, a State's plan must include "emission limitations, schedules, and timetables for compliance with such limitations"; it must also contain such other measures as may be necessary to insure both timely attainment and subsequent maintenance of national ambient air standards. § 110(a)(2)(B).
 
 
 10
 Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 65-67, 95 S.Ct. 1470, 1475, 43 L.Ed.2d 731 (1975). (Footnote omitted.)
 
 
 11
 The vital role of the state EPA and its role in "developing policy choices as to the most practicable and desirable methods of restricting total emissions to a level which is consistent with the national ambient air standards" (Emphasis added.) is described as follows:
 
 
 12
 The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. Under § 110(a)(2), the Agency is required to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards. § 110(c). Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.
 
 
 13
 This analysis of the Act's division of responsibilities is not challenged by respondents insofar as it concerns the process of devising and promulgating an initial implementation plan. Respondents do, however, deny that the States have such latitude once the initial plan is approved. Yet the third paragraph of § 110(a), and the one immediately following the paragraphs which specify that States shall file implementation plans and that the Agency shall approve them if they satisfy certain broad criteria, is the section which requires the Agency to "approve any revision of an implementation plan" if it "determines that it meets the requirements" of § 110(a)(2). On its face, this provision applies to any revision, without regard either to its breadth of applicability, or to whether it is to be effective before or after the attainment date; rather, Agency approval is subject only to the condition that the revised plan satisfy the general requirements applicable to original implementation plans. Far from evincing congressional intent that the Agency assume control of a State's emission limitations mix once its initial plan is approved, the revision section is to all appearance the mechanism by which the States may obtain approval of their developing policy choices as to the most practicable and desirable methods of restricting total emissions to a level which is consistent with the national ambient air standards.
 
 
 14
 Train v. Natural Resources Defense Council, Inc., supra at 79-80, 95 S.Ct. at 1481 (Footnote omitted.)
 
 
 15
 Finally, the Supreme Court points to the two means provided by the Act in §§ 110(a)(3) and 110(f) for polluters to secure consideration and possible relief from economic and technological problems by way of postponements or variances:
 
 
 16
 We believe that the foregoing analysis of the structure and legislative history of the Clean Air Amendments shows that Congress intended to impose national ambient air standards to be attained within a specific period of time. It also shows that in §§ 110(e) and (f) Congress carefully limited the circumstances in which timely attainment and subsequent maintenance of these standards could be compromised. We also believe that Congress, consistent with its declaration that, "Each State shall have the primary responsibility for assuring air quality" within its boundaries, § 107(a), left to the States considerable latitude in determining specifically how the standards would be met. This discretion includes the continuing authority to revise choices about the mix of emission limitations. We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was "correct," to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the "correct" one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency.
 
 
 17
 Train v. Natural Resources Defense Council, Inc., supra at 86-87, 95 S.Ct. at 1485.[2]
 
 
 18
 Since the record now before us demonstrates that these processes of adjustment are presently proceeding exactly as, and where the statute contemplated, and that no final resolution as to them has been arrived at, this case is not presently ripe for judicial review. Toilet Goods Association, Inc. v. Gardner, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
 
 
 19
 We can perceive no immediate harm to petitioners in allowing the environmental protection administrative processes to arrive at definitive administrative conclusions on these disputed issues. And we can see much harm to the entire national effort to clean the ambient air in judicial action which would delay the statutory timetable.
 
 
 20
 The stays previously entered are vacated and the petitions presently before this court are dismissed without prejudice.
 
 
 
 [1]
 Petitioners may also be contending that this case should again be remanded to the federal Administrator for consideration of economic and technological issues. We believe, however, that the rulemaking remand ordered in Buckeye (I), 481 F.2d 162 (6th Cir. 1973), was designed specifically for that purpose. Petitioners had full opportunity to present their contentions on these matters, and we have no claim that they were prevented from doing so. In the Approval & Promulgation of State Implementation Plans, Ohio, published in the Federal Register, April 15, 1975, 39 Fed.Reg. 13539 (1974), the Administrator refers to petitioners' contentions and data and gives his conclusions thereafter. No further remand on these issues appears appropriate at this stage of the proceedings
 
 
 [2]
 We recognize, of course, that both our circuit and others have undertaken interpretations of this same statute with some marked differences of interpretation. Buckeye Power, Inc. v. Environmental Protection Agency, 481 F.2d 162 (6th Cir. 1973); Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 478 F.2d 875 (1st Cir. 1973); Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 483 F.2d 690 (8th Cir. 1973); Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 494 F.2d 519 (2d Cir. 1974); Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 507 F.2d 905 (9th Cir. 1974). It goes without saying that we are required to accept the subsequent Supreme Court interpretation in Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975)