HURON VALLEY HOSPITAL, INC., a Michigan non-profit corporation, Plaintiff,

v.

CITY OF PONTIAC, a Michigan municipal corporation, City of Pontiac Hospital Building Authority, a municipal corporate entity, Comprehensive Health Planning Council of Southeastern Michigan, a regional health planning agency, North Oakland County Planning Steering Committee, a planning group under the auspices of Greater Detroit Area Hospital Council, Inc., a Michigan corporation, Michigan Department of Public Health, an executive agency of the State of Michigan, Department of Health, Education and Welfare, an executive agency of the federal government, Defendants.

Civ. No. 78–72970.

United States District Court, E. D. Michigan, S. D.

March 2, 1979.

**1304**

Donald J. Gasiorek, Lawrence S. Jackier, Southfield, Mich., for plaintiff.

Larry J. Saylor, Detroit, Mich., Samuel Mostkoff, Southfield, Mich., Grady Avant, Jr., Detroit, Mich., William Perrone, Asst. Atty. Gen., Lansing, Mich., Nancy M. Floreen, U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

CORNELIA G. KENNEDY, Chief Judge.

Plaintiff Huron Valley Hospital, Inc. (Huron Valley or plaintiff) is a non-profit organization formed for the purpose of building a new hospital in northwest Oakland County, Michigan. It has filed this action alleging that all defendants with the exception of the Department of Health, Education and Welfare (HEW) have conspired to exclude it from the market of providing hospital facilities and services, in violation of the federal antitrust laws. It seeks treble damages and injunctive relief against all defendants except HEW and declaratory relief against HEW and the Michigan Department of Public Health (MDPH). All defendants have moved to dismiss and in the alternative for summary judgment.

In September, 1976, plaintiff made a combined application to the MDPH for a Certificate of Need under M.C.L.A. § 331.451 *et seq.*, M.S.A. § 14.1179(51) *et seq.* (the Certificate of Need Act), and for Capital Expenditure Review under 42 U.S.C. § 1320a–1 requesting approval for the construction of a new 153-bed hospital in the western part of Service Area 76 (an administrative area within Oakland County). The Michigan Legislature has established a hospital and medical facilities division within the Michigan Department of Public Health and vested it with various health facilities planning responsibilities.

The Congress has established a "Capital Expenditure Review" program to assure that federal funds appropriated for medicare, medicaid and other federal programs are not used to support unnecessary capital expenditures for health care facilities. This program requires the Secretary of Health, Education and Welfare to enter into an agreement with the governor of a state whereby a state health planning agency is established within the state. MDPH has been designated in accordance with this procedure as the state health planning agency in Michigan. Among other duties it is to review applications from health care

providers for proposed capital expenditures to determine whether the proposals are consistent with plans developed pursuant to the Hill-Burton Act (42 U.S.C. § 291 *et seq.*). The state planning agency is to consider the findings and regulations of the appropriate regional planning agency (42 U.S.C. § 1320a–1(d)(1)(B)(ii)). The regulations of the state planning agency are forwarded to the Secretary of HEW. An applicant receiving an adverse recommendation has the right to an appellate administrative hearing. The governor of each state, subject to the approval of the Secretary of HEW, designates health service areas within a state (42 U.S.C. § 300*l*(a), § 300*l*(b)). A Health Systems Agency corresponding to each health service area is to be established pursuant to 42 U.S.C. § 300*l*–1 and § 300*l*–4. Defendant Comprehensive Health Planning Counsel of Southeastern Michigan (CHPC–SEM) has been conditionally designated as the health systems agency for a seven-county area which includes Oakland County. It is charged with assembling and analyzing data regarding the health care delivery system in the area, developing a plan outlining regional goals and reviewing and making recommendations to the state planning agency with respect to proposed new institutional health services in its planning area (42 U.S.C. § 300*l*–2(f)). Only states complying with these requirements may receive federal funding for a wide variety of purposes relating to health care.

In 1972 the Michigan Legislature established the requirement that persons wishing to engage in certain health care facility construction must first obtain a state "Certificate of Need." 1972 P.A. 256 as amended, M.C.L.A. § 331.451–462, M.S.A. § 14.-1179(51)–.1179(62). Such a certificate is required for construction where no facility previously existed as well as for replacement of existing health care facilities. In determining whether to issue such certificate the Director of MDPH is to consider the recommendations of the relevant regional planning agency, and both planning agencies are directed to consider a variety of factors set out in the statute. M.C.L.A.

§ 331.455a, M.S.A. § 14.1179(55a). The Act further provides that:

> A Certificate of Need shall be consistent with but need not follow exactly the state plan for hospital and medical facilities construction and the policies and procedures governing the issuance of Certificates of Need required under federal grant-in-aid programs or federal loan guarantee programs. M.C.L.A. § 331.454, M.S.A. § 14.1179(54).

Act 256 further establishes a State Health Facilities Commission within the MDPH, M.C.L.A. § 331.452, M.S.A. § 14.-1179(52), and charges that body with advising the Director, M.C.L.A. § 331.453(1), M.S.A. § 14.1179(53)(1). An applicant or the local Health Systems Agency "aggrieved" by a decision of the Director with respect to a Certificate of Need application may request a hearing by the Commission and may appeal a final order of the Commission to the appropriate county circuit court, M.C.L.A. §§ 331.453(2), 331.458, M.S.A. §§ 14.1179(53)(2), 14.1179(58).

The Plan Implementation Committee of the Comprehensive Health Planning Council of Southeastern Michigan, the regional health planning agency under 42 U.S.C. § 300*l*–1 *et seq.*, reviewed plaintiff's application and recommended denial; the Health Facilities Commission of the MDPH endorsed this recommendation. The MDPH Director then reviewed the application for Certificate of Need and denied it on July 5, 1977. The Director also recommended that the Secretary of HEW deny the application for Capital Expenditure Review, and the Secretary acted in accord with this recommendation. Plaintiff then filed notices of administrative appeals of both denials which contained, *inter alia*, allegations that the actions of the MDPH were in restraint of trade.

Defendant Pontiac General Hospital (Pontiac or PGH) filed an application for a Certificate of Need and Capital Expenditure Review with MDPH on December 1, 1977. MDPH has identified many deficiencies in the existing physical plant of Pontiac

General and if these deficiencies are not remedied it cannot continue to be licensed to operate under 1968 P.A. 17, M.C.L.A. § 331.411 et seq., M.S.A. § 14.1179(1) et seq. The application for Certificate of Need and Capital Expenditure Review submitted by Pontiac General Hospital seeks the necessary state and federal approval for a replacement-renovation of the existing hospital. This replacement-renovation would reduce the number of medical-surgical beds from 383 to 350 and would correct existing defects in the physical plant in order to insure continued full licensing under Act 17. It is proposed that the construction program be financed through a combination of general obligation bonds of the City of Pontiac and revenue bonds of the State of Michigan Hospital Building Authority.

Pontiac's application was submitted to CHPC–SEM for review; the CHPC–SEM Plan Implementation Committee recommended approval and CHPC–SEM endorsed this recommendation on January 12, 1978. MDPH in turn recommended that the Secretary of HEW approve Pontiac's Capital Expenditure Review, and the Secretary issued his approval.

On February 4, 1978, plaintiff filed a complaint in the Oakland County Michigan Circuit Court seeking immediate judicial relief and alleging, inter alia, that its administrative appeal was futile and that the imminent approval by MDPH of Pontiac's Certificate of Need application would moot the issues raised in its appeal. Plaintiff also alleged that the administrative actions were in restraint of trade and tended to create a monopoly. The Oakland County Circuit Court entered a preliminary injunction restraining the grant of Pontiac's application for a Certificate of Need. However, that court dismissed the remaining counts of plaintiff's complaint, including those alleging monopoly and restraint of trade, holding that plaintiff had failed to exhaust its administrative remedies and that all of these claims "can be heard and determined in said administrative proceedings." The Circuit Court initially retained jurisdiction of the action to preserve its preliminary injunction and to permit plaintiff to appeal (pursuant to Michigan's Certificate of Need Act) any final adverse administrative decision. The Oakland Circuit Court concluded on August 25, 1978 that since Pontiac's financial capability to construct the proposed replacement-renovation would be jeopardized if the Certificate of Need were not issued it would suffer immediate and irreparable harm if the preliminary injunction were allowed to remain in effect. The court therefore dissolved the preliminary injunction and certified its decision as final. Pontiac's Certificate of Need was then approved by MDPH. Plaintiff filed a timely notice of appeal to the Michigan Court of Appeals. That appeal is still pending.

Hearings on the administrative appeal from the MDPH Director's recommendation of Capital Expenditure Review denial have been indefinitely adjourned at plaintiff's request. Presentation of evidence to the hearing examiner in connection with the Certificate of Need appeal has been concluded, but the hearing examiner has not yet made his recommendations. When those recommendations are made they must then be forwarded to the Health Facilities Commission, which will review the entire record before entering a final order.

Huron Valley alleges in its complaint that defendant Pontiac General Hospital conspired with its co-defendants and certain other unnamed co-conspirators to allocate hospital beds within the market area (Pontiac Service Area 76) in order to restrain plaintiff from entering the market and to fix prices at non-competitive levels, all in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The means employed toward this end, plaintiff alleges, include (1) forming the North Oakland County Hospital Planning Steering Committee; (2) inducing CHPC–SEM and MDPH to act in concert with the conspirators in the denial of plaintiff's application and the approval of defendant Pontiac's application; and (3) creating publicity adverse to plaintiff (Count I). Plaintiff further alleges that each of the other acts complained of was taken at the instigation of Pontiac, and that these actions thus constitute monopolization, an

attempt to monopolize, and a conspiracy to monopolize on the part of Pontiac, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2 (Count II).

During review of plaintiff's application by CHPC–SEM, the president of Pontiac General Hospital was invited to comment on the pending application and did so in writing. Defendants assert by affidavit that there was no other formal or informal influence by Pontiac upon Huron Valley's application.

During the relevant period, Pontiac also participated in the North Oakland County Planning Steering Committee, an unincorporated voluntary organization composed of representatives from four hospitals in Service Area 76 with a non-voting representative of defendant Greater Detroit Area Hospital Council (GDAHC). The function of the Steering Committee is to study and make recommendations concerning the provision of medical-surgical acute-care services by hospitals in the Oakland County area. GDAHC is composed of representatives of hospitals throughout the greater Detroit metropolitan area. Defendant Steering Committee denies any actions by itself or its members designed to influence the administrative consideration of plaintiff's application, other than the letter to CHPC–SEM from the then-President of Pontiac General Hospital.

Plaintiffs have requested the right to take discovery depositions of the persons involved in the various procedures referred to above as well as to examine the records of defendants. It has further responded to defendants' motions for summary judgment with affidavits. These affidavits, in brief, aver that plaintiff had to face more rigorous standards for approval than did defendant Pontiac, and that due to various other policies and procedures of GDAHC and CHPC–SEM which favor existing over new ("from ground up") facilities, plaintiff's fate was sealed in advance. It is alleged in addition that plaintiff's application was denied because of personal animosity on the part of certain members of CHPC–SEM toward Dr. Martin Trepel, a consultant to plaintiff's staff. Dr. Trepel states in his affidavit that an Assistant Executive Director of CHPC–SEM told him that plaintiff's getting its Certificate of Need depended on "twisting the proper arms" of CHPC–SEM's Executive Committee. Dr. Trepel also alleges that at a meeting with the city manager and the mayor of Pontiac, he was told by the latter that they could not afford politically to reach a public accommodation with plaintiff. In his affidavit, Ralph W. Wiese, Chairman of the Board of Directors of Huron Valley, states that on February 22, 1977, a group called "Pontiac Citizens Coalition on PGH" wrote to CHPC–SEM opposing plaintiff's application on the grounds that the granting of a Certificate of Need to plaintiff would undermine PGH's development plan. Wiese also alleges that at CHPC–SEM's executive hearing on plaintiff's application, Paul Masseron, Chairman of the Plan Implementation Committee of CHPC–SEM, acted as an advocate for PGH. Although disputed in part by defendants, for the purpose of these motions these allegations will be assumed to be true. None, however, raises issues of material fact required to be resolved for disposition of this action.

*I. Ripeness and Related Doctrines—Due Process*

Plaintiff has two appeals still pending—one in the Michigan Court of Appeals, and the other an appeal from the MDPH Director's denial of Capital Expenditure Review (indefinitely adjourned by plaintiff). Hence considerations of exhaustion of administrative remedies, ripeness, abstention and federal-state comity preclude entertaining the merits of plaintiff's claims. Where plaintiff has failed to exhaust administrative remedies (where such is explicitly provided or implicitly assumed to exist), judicial review is inappropriate. *Renegotiation Board v. Bannercraft Clothing Co., Inc.,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *McGee v. United States,* 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); *McKart v. United States,* 395 U.S. 185, 89

S.Ct. 1657, 23 L.Ed.2d 194 (1969). The rationale for this rule is based on "the absence of any 'lawful function' on the part of the courts 'to anticipate the administrative decision with their own,'" *Renegotiation Board, supra,* 415 U.S. at 21, 94 S.Ct. at 1039, *quoting Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 767, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947). To the extent that plaintiff has filed appeals in accordance with 42 C.F.R. § 100.106(c), M.C.L.A. § 331.453(2) [M.S.A. § 14.1179(53)(2)] and M.C.L.A. § 331.458 [M.S.A. § 14.1179(58)] and filed an action in the Oakland County Circuit Court, further claims challenging the same actions of defendant would be superfluous and contrary to sound judicial policy. *Schaefer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1299–1300 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). ("By electing to make their claim for relief under the securities acts, the plaintiffs have rendered their antitrust claims superfluous." *Id.* at 1300.)

The ripeness doctrine is especially relevant given the appeals pending in both the administrative and state tribunals. In a leading case, the Supreme Court stated that the purpose of the ripeness doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). While initial decisions were handed down by both the administrative and state tribunals, the full course of review on both tracks has not yet been run, so that judicial review is precluded at this premature stage. "Since the record now before [the court] demonstrates that these processes of adjustment are presently proceeding exactly as, and where the statute contemplated, and that no final resolution as to them has been arrived at, this case is not presently ripe for judicial review." *Buckeye Power, Inc. v. E. P. A.,* 525 F.2d 80, 84 (6th Cir. 1975), *citing Abbott Laboratories, supra,* and *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

Federal-state comity and abstention doctrines also militate against judicial review, since the state appeal and administrative review are still pending. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Railroad Comm. of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The applicable policy considerations governing abstention were articulated for this Circuit in *Gay v. Board of Registration Commissioners,* 466 F.2d 879, 883 (6th Cir. 1972):

> The first of these is the avoidance of a premature constitutional decision by a possible narrowing construction of the state law by a state court. *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); *Cf. Zwickler v. Koota,* 389 U.S. 241, 255, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (Harlan, J., concurring). A second policy reason underpinning the principle is the avoidance of needless conflict in the federal-state relationship. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). A third consideration is the desirability of avoiding the necessity of a federal court making tentative decisions on issues of state law. *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); *Meredith v. Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). A fourth basic reason justifying abstention is the avoidance of unnecessary interference with state functions or regulatory schemes. *Lake Carriers' Association v. MacMullan, supra; Younger v. Harris, supra.*

Most if not all of the same considerations exist here. The Michigan courts' decisions will permit the state to define the perimeters of state action in the procedures about which plaintiff complains. Nothing could be more disruptive of state regulatory procedures than for a litigant to have a suit

pending against the state regulatory body while that body is concluding its hearings on that litigant's claims.

Plaintiff urges that the defendants' conspiracy has prevented it from receiving a fair consideration of its application for a Certificate of Need. However, it does not claim that defendants' acts have prevented it from presenting anything to the Administrative Law Judge now hearing its appeal. The state procedures provide plaintiff with a full opportunity to assert and to have corrected all violations of state law. Thus M.C.L.A. § 24.306, M.S.A. § 3.560(206) (the Michigan Administrative Procedures Act) provides:

> (1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of any agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:
>
> (a) In violation of the constitution or a statute.
>
> (b) In excess of the statutory authority or jurisdiction of the agency.
>
> (c) Made upon unlawful procedure resulting in material prejudice to a party.
>
> (d) Not supported by competent, material and substantial evidence on the whole record.
>
> (e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.
>
> (f) Affected by other substantial and material error of law.

Review is also provided for in the Certificate of Need Act, M.C.L.A. § 331.458, M.S.A. § 14.1179(58), as follows:

> If when the person who applies for a certificate of need is aggrieved by the decision of the director or if the recommendation of the local planning council is not accepted then he or the local planning council may request a hearing to be conducted by the commission in accordance with and subject to Act No. 306 of the Public Acts of 1969, as amended. If the certificate of need is not granted by the commission or the person who applies for

the certificate of need is aggrieved by the decision of the commission, then he or the local planning council may appeal to the circuit court of the county in which the appealing health facility is located requesting an order reversing the decision of the commission in the same manner as is provided for a civil suit.

■ Plaintiff has yet to pursue any proceedings to become eligible for medicare and medicaid payments under 42 U.S.C. § 1320a–1, since it is yet to be licensed as a hospital. Claims relating to procedures for that eligibility are therefore premature. Given the inconclusive status of the state proceedings, abstention precludes present review of plaintiff's claim by this court. Thus defendants are entitled at least to a stay of all proceedings.

The problem is close to that in *Ricci, supra,* and is, as the United States Supreme Court stated,

> recurring. It arises when conduct seemingly within the reach of the antitrust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress. Often, but not always, the other regime includes an administrative agency with authority to enforce the major provisions of the statute in accordance with that statute's distinctive standards, which may or may not include concern for competitive considerations.

*Ricci, supra,* 409 U.S. at 299–300, 93 S.Ct. at 579 (footnote omitted). Plaintiff in *Ricci* had purchased a membership in the Chicago Mercantile Exchange, using funds borrowed from the Siegel Trading Company, a member of the Exchange. Subsequently the Exchange, at the behest of the Trading Company, transferred the membership without notice or hearing, utilizing a blank transfer authorization that had previously been revoked. Plaintiff charged that this conduct violated both the rules of the Exchange and the Commodity Exchange Act as well as § 1 of the Sherman Act. The Court held that the antitrust proceedings should be stayed until the Commodity Exchange Commission could assess the validity

of the defendants' conduct under the Commodity Exchange Act. The opinion recognized "that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern." *Federal Maritime Board v. Isbrandtsen Co.,* 356 U.S. 481, 498, 78 S.Ct. 851, 861, 2 L.Ed.2d 926 (1958), *quoted in Ricci, supra,* 409 U.S. at 305–06, 93 S.Ct. 573.

 Plaintiff's application was reviewed and denied by MDPH a number of months before defendant Pontiac's application was submitted and approved. Under well-settled law, plaintiff has no Fourteenth Amendment due process right either to have participated in the Pontiac hearing—since its own interest (if any) was by that time extinct and could not have been affected—or to have its application approved. To have a cognizable property interest in a government benefit, the Supreme Court stated in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), there must be more than an abstract need or desire for it. A person "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709. *Accord, Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Since plaintiff had at best a unilateral expectation, and not a protected property interest, which in any event was eliminated before the Pontiac hearing, there has been no deprivation of a protected interest outside the standards of due process, nor has plaintiff alleged any circumstances which would place the nature of the hearings themselves (where the proceedings were matters of public record and conflicts of interest scrupulously disclosed) outside the bounds of due process. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (conclusory charges of bias insufficient to impugn due process fairness of state administrative hearing).

 The State of Michigan may deny the plaintiff a Certificate of Need. If it does so, the plaintiff, never having been eligible to enter the market of supplying hospital services, can claim no deprivation of any due process right. In *New Motor Vehicle Board v. Orrin W. Fox Co.,* —— U.S. ——, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), a California statute required an automobile manufacturer to obtain the approval of the California New Motor Vehicle Board before opening or relocating a retail dealership within the market area of an existing franchise if the latter protested, and the statute also directed the California Board to notify the manufacturer of this requirement upon the existing franchisee's filing of a protest. The Board was not required to hold a hearing on the merits of the protest before sending the notice to the manufacturer. The Supreme Court held that the absence of a prior hearing requirement—and the possibility of delaying the consummation of the business plans of the potential franchisees—did not constitute a denial of Fourteenth Amendment procedural due process.

Even if the right to franchise had constituted a protected interest when California enacted the [statute], California's Legislature was still constitutionally empowered to enact a general scheme of business regulation that imposed reasonable restrictions upon the exercise of the right. . . .

In particular, the California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices. . . .

Further, the California Legislature had the authority to protect the conflicting rights of the motor vehicle franchisees through customary and reasonable procedural safeguards; *i. e.,* by providing existing dealers with notice and an opportunity to be heard by an impartial tribunal—the New Motor Vehicle Board—before their franchisor is permitted to inflict upon them grievous loss. Such procedural safeguards cannot be said to deprive the franchisor of due process. States may, as California has done here,

require businesses to secure regulatory approval *before* engaging in specified practices. See, *e.g. North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, [94 S.Ct. 407, 38 L.Ed.2d 379] (1973) (Pharmacy operating permit), *St. Louis Poster Adv. Co. v. St. Louis,* 249 U.S. 269, [39 S.Ct. 274, 63 L.Ed. 599] (1919) (billboard permits), *Hall v. Geiger-Jones Co.,* 242 U.S. 539, [37 S.Ct. 217, 61 L.Ed. 480] (1917) (securities registration), *Adams v. Milwaukee,* 228 U.S. 572, [33 S.Ct. 610, 57 L.Ed. 971] (1913) (milk inspection), *Gundling v. Chicago,* 177 U.S. 183, [20 S.Ct. 633, 44 L.Ed. 725] (1900) (cigarette sales license).

At ——, 99 S.Ct. at 410–11. (emphasis in original). That situation is made no less pertinent to this by the fact that the California Board may ultimately approve some of the franchise candidates; the Board may just as easily, as the MDPH has done here, reject the applicant.

■ Even assuming arguendo the activities in question come under the antitrust laws, an established line of cases holds that mere negotiations toward contracts (as opposed to finished, binding contracts) are not "business or property" deserving of antitrust protection. *Hecht v. Pro Football, Inc.,* 187 U.S.App.D.C. 73, 86, 570 F.2d 982, 995 (1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). *Accord, Peller v. Int'l Boxing Club, Inc.,* 227 F.2d 593 (7th Cir. 1955). Analogously to the Supreme Court's constitutional due process doctrine, "[a] mere subjective intent to establish a new enterprise or to expand an already existing business is not enough on which to base standing to sue; there must be overt and objective preparations." *N. W. Controls, Inc. v. Outboard Marine Corp.,* 333 F.Supp. 493, 507 (D.Del.1971); *accord, Martin v. Phillips Petroleum Co.,* 365 F.2d 629 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 395–96 (6th Cir. 1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). Here, as in *Volasco,*

There was only a stated intention to enter into this additional production with

no overt act performed in connection therewith and no expenditure of money to provide the required facilities. Preparedness and capacity to engage in a business mean more than an intention so to do and an ability to buy the necessary facilities.

308 F.2d at 395–96 (authorities omitted). Hence under the standards of due process and antitrust standing, plaintiff fails to state a claim on which relief can be granted.

## II. Exemption from the Antitrust Laws

■ The actions of which plaintiff complains, moreover, fall into well-defined exceptions to the antitrust laws. The regulatory actions of MDPH and CHPC–SEM alleged in the complaint are within the ambit of valid federal and state legislation, and as such are exempted from the antitrust laws under the "state action" defense of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *accord, City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Legislation is not invalid merely because it may have an anticompetitive effect; otherwise, "the States' power to engage in economic regulation would be effectively destroyed." *Exxon v. Governor of Maryland,* 437 U.S. 117, 133, 98 S.Ct. 2207, 2218, 57 L.Ed.2d 91 (1978). "Legislative bodies have broad scope to experiment with economic problems . . . ." *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). Moreover, "the right to conduct a business, or to pursue a calling, may be conditioned. . . . [S]tatutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they enter into agreements, are within the state's competency." *Nebbia v. New York,* 291 U.S. 502, 528, 54 S.Ct. 505, 512, 78 L.Ed. 940 (1934) (footnotes omitted); *accord, New Motor Vehicle Board, supra,* —— U.S. at ——, 99 S.Ct. 403.

■ Plaintiff has vigorously attacked the state Certificate of Need process because it excludes new entrants into the

hospital field for the benefit of existing hospitals. Yet this is exactly what the state regulatory scheme demands. Defendants are not relieved of liability because of their status as public bodies but rather because they are acting pursuant to the state's mandate in restricting entry of new health care providers. The legislative history of the Congressional enactments at issue unequivocally supports defendants' contention that state regulation of health care facilities is explicitly exempted from the reach of the antitrust laws. The express policy of one of the relevant statutory provisions, the National Health Planning and Resources Development Act of 1974, Pub.L. No. 93–641, 42 U.S.C. § 300k et seq., is to effect "equal access to quality health care at a reasonable cost" as a priority of the federal government. 42 U.S.C. § 300k(a)(1). Specifically, the Senate Committee Report on the bill stated, as a reason for instituting the legislation,

> The need for strengthened and coordinated planning for personal health services is growing more apparent each day. *In the view of the Committee the health care industry does not respond to classic marketplace forces.* The highly technical nature of medical services together with the growth of third party reimbursement mechanisms act to attenuate the usual forces influencing the behavior of consumers with respect to personal health services. For the most part, the doctor makes purchasing decisions on behalf of the patient and the services are frequently reimbursed under health insurance programs, thus reducing the patient's immediate incentive to contain expenditures.

S.Rep. No. 93–1285, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7842, 7878 (emphasis added). *See generally American Medicorp, Inc. v. Humana, Inc.,* 445 F.Supp. 589, 592–93 (E.D.Pa.1977) (history of the legislation as response to the spiralling cost of health care delivery). The activities covered by the 1974 Act were thus recognized as being outside the rationale and scope of the antitrust laws. One of the sponsors of the Act explained:

Although Public Law 93–641 contains no specific exemption from the antitrust laws, an analysis of the activities required of HSA's [Health Systems Agencies, regional state boards established under 42 U.S.C. § 300*l*–1 et seq., such as CHPC–SEM] and providers indicates that Congress sanctioned actions which might otherwise be in violation of our antitrust laws. *The intent of Congress was that HSA's and providers who voluntarily work with them in carrying out the HSA's statutory mandate should not be subject to the antitrust laws.* If they were, Public Law 93–641 simply could not be implemented.

124 Cong.Rec. Hll, 963 (daily ed. Oct. 10, 1978) (remarks of Rep. Rogers) (emphasis added). Thus the Congress in authorizing state hospital planning agencies intended a partial repeal of the antitrust laws. In requiring the inclusion of current providers as members of planning agencies, and directing the planning agencies to restrict the building of unnecessary beds so that existing hospital beds would be more fully utilized, the inevitable effect is to restrict or restrain competition. It is, in fact, precisely the competition of the free market which the Congressional purpose seeks to check. Plaintiff admitted in oral argument that Congress intended some implied repeal of the antitrust laws in this respect but urges that it was only to permit a restriction on the total number of beds allowed in a geographic area, so that there should be free competition to supply those beds. Plaintiff fails, however, to suggest how this is to be done.

 Further, the alleged conspiracy falls within the *Noerr-Pennington* doctrine, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which protects attempts to influence governmental units and instrumentalities in order to obtain legislation, redress, or action favorable to particular interests. *Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506

(6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972). The doctrine does not protect affirmative attempts to block access to adjudicatory tribunals, *i. e.* "sham protests." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Bribery of a public purchasing agent may constitute a violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c). *Id.* at 513, 92 S.Ct. 609. No such affirmative act is alleged by plaintiff. All of defendants' challenged actions were expressly designed to secure favorable administrative or judicial action. "Nothing could be clearer from the [Supreme] Court's opinion [in *Noerr*] than that anticompetitive purpose did not illegalize the conduct there involved." *Pennington, supra,* 381 U.S. at 669, 85 S.Ct. at 1593. Defendants' motive or intent in the alleged publicity is irrelevant for Sherman Act purposes, since "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Pennington, supra,* 381 U.S. at 670, 85 S.Ct. at 1593. Hence both the *Parker v. Brown* state action defense and the *Noerr-Pennington* defense are called into play and dovetail where, as here, defendants sought only to secure favorable administrative action from a duly authorized agency of the state acting pursuant to valid federal and state economic regulation. In *New Motor Vehicle Board, supra,* it was contended that the state statute conflicted with the Sherman Act since by delaying the establishment of dealerships whenever competing franchisees protest, the scheme gives effect to privately initiated restraints on trade, and hence was invalid under *Schwegmann Bros. v. Calvert Distillers,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). The Court answered

> that the [statute's] regulatory scheme is a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships. The regulation is therefore outside the reach of the antitrust laws under the "state action" exemption.

—— U.S. at ——, 99 S.Ct. at 412, *citing Parker v. Brown, supra; Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *City of Lafayette v. Louisiana Power & Light Co., supra.* Moreover, the Court held that *Noerr-Pennington* protects "[p]rotesting dealers who invoke in good faith their statutory right to governmental action in the form of a Board determination that there is good cause for not permitting a proposed dealership." —— U.S. at ——, 99 S.Ct. at 412. By contrast, *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), relied on by plaintiff to bring its claim under the Sherman Act, is inapplicable on its facts and leaves the *Parker v. Brown* and *Noerr-Pennington* defenses intact for the instant defendants. In *Hospital Building,* a 49-bed community hospital owned by an out-of-state proprietary chain alleged that a second hospital and its administrators had conspired with a local health planning official and others in violation of the Sherman Act to delay and prevent the issuance of a state Certificate of Need in order to keep the plaintiff from relocating and expanding its facilities. The Court held that "since in this case the allegations fairly claim that the alleged conspiracy . . . [would] place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce, they are wholly adequate to state a claim." 425 U.S. at 746, 96 S.Ct. at 1853, *quoting United States v. Employing Plasterers Ass'n,* 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954). However, the plaintiff in *Hospital Building* accused respondents and their co-conspirators of having "employed a series of bad-faith tactics, including the bringing of frivolous litigation, to block the implementation of the expansion." 425 U.S. at 741, 96 S.Ct. at 1850. The reason why those allegations fairly claim an unlawful conspiracy, and the present ones do not, is in significant part because the former charge activities falling squarely within the "mere sham" exception to the *Noerr-Pennington* rule. *Noerr, supra,* 365 U.S. at 144, 81 S.Ct.

523. The exception applies to the use of administrative or judicial processes where the purpose to suppress competition, by depriving competition of meaningful access to the agencies and courts, is evidenced by repetitive lawsuits bearing the hallmark of insubstantial claims. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 380, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Trucking Unlimited, supra,* 404 U.S. at 512–13, 92 S.Ct. 609. Such was the complaint in *Hospital Building;* instant plaintiffs, however, do not impute "mere sham" proceedings to defendants and plaintiff has in fact been able to pursue its claims in every tribunal available under the appropriate statutes.

Plaintiff, both in its Brief in Opposition to Defendants' Motion to Dismiss and in oral argument, relies on *Duke & Co., Inc. v. Foerster,* 521 F.2d 1277 (3d Cir. 1975), for the proposition that joint conduct (favoring defendants) is not immunized under the *Noerr-Pennington* doctrine where members of the alleged conspiracy include public officials. Plaintiff cites *Duke* as follows:

> Both *Noerr* and *Pennington* involved suits against *private parties* who had allegedly conspired to influence governmental action. In neither case was it alleged that the governmental entity had collaborated to promote the conspiracy. *Where the complaint goes beyond mere allegations of official persuasion by anti-competitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the Noerr-Pennington doctrine is inapplicable.*

521 F.2d at 1282, *quoted in* Plaintiff's Opposition Brief at 36 (emphasis added by plaintiff). However, on the developed facts *Duke* is distinguishable because the acts taken by members of CHPC–SEM and MDPH were within the bounds of the state's enacting legislation; *Noerr-Pennington* would be inapplicable if, pursuant to a conspiracy, the relevant members took action inconsistent with their roles in the state's health care regulatory scheme, hence outside *Parker v. Brown* immunity as well. (The *Noerr-Pennington* rule was extended to attempts to influence administrative agencies and judicial proceedings in *Trucking Unlimited, supra.*) This is the distinction of *Duke* made by *Kurek v. Pleasure Driveway and Park District of Peoria,* 557 F.2d 580, 593 (7th Cir. 1977):

> Nor is the fact that GSM combined or conspired with governmental officials dispositive, for both of *Noerr's* premises with respect to that point are undercut by the factual setting of this case. Our determination that the Park District and its officials had no state mandate or authority to engage in the activities attacked here necessarily reduces the applicability of the reasoning of *Noerr* to the degree it is based on the need of governmental units for citizen input in making decisions that *Parker* holds to be outside the scope of the Sherman Act. *See Duke & Company, Inc., supra,* 521 F.2d at 1282.

GSM were defendant concessionaires who outbid plaintiffs, former concessionaires, for the right to sell golf equipment and services on municipal golf courses; defendant Park District allegedly demanded 5% of gross sales as concession fee and required, as a condition of concession renewal, that plaintiffs raise and fix their prices. Defendant Park District also allegedly used the threat of an award of a monopolistic license to GSM. The court held that Park District lacked a state mandate for state-action exemption purposes since it had substantially less than statewide jurisdiction and "[w]e simply see little sense in automatically treating as state mandates the activities of local governmental units when these activities may vary substantially from unit to unit and may be wholly lacking in any express or implied state authorization or command." 557 F.2d at 590. GSM in its role of successful bidder for the concessions could not be found liable under the antitrust laws, since "successful bidding does not violate the antitrust laws substantively," 557 F.2d at 592. Thus in *Duke,* in the paragraph just preceding that cited by plaintiff, the court stated:

> Defendants contend that *Noerr-Pennington* immunity covers a state governmental entity which "listens to anti-competitive pleas." Doubtlessly this proposi-

tion is correct so long as the public body acts within its legal discretion and in what it considers the public interest. . . .

521 F.2d at 1282. Similarly, in *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir. 1975), defendant obtained the first granted cable television license in a city and successfully induced the city council not to license a potential competitor. The Seventh Circuit Court of Appeals found that *Noerr* foreclosed antitrust liability. At 516 F.2d at 230, the court said:

> In the case at bar, the allegations on the basis of which the defendant mayor and alderman are said to have been co-conspirators are that they were persuaded by two members of the public, who are also defendants, to support the CATV application and to oppose plaintiff's application, and that they were given campaign contributions "in exchange," for this undertaking. These allegations do not take the case outside the protection of the *Noerr* doctrine. Plaintiff's position is in essence that an agreement to attempt to induce legislative action is a "conspiracy," and that if some of the "conspirators" persuade a member of the legislative body to agree to support their cause, he becomes a "co-conspirator" and a Sherman Act violation results. Such a role would in practice abrogate the *Noerr* doctrine. It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became such "co-conspirators." . . . Nothing in the *Noerr* opinion or any other case of which we are aware suggests any reason for believing that Congress, not having intended the Sherman Act to apply to combined efforts to induce legislative action, did intend the Act to apply if a member of the legislative body agreed to support those efforts.

Even a valid governmental decision made at least partially on the basis of personal or political considerations (*cf.* instant plaintiff's allegations of personal animosity toward Dr. Trepel) is immune from antitrust liability:

local government units such as city councils and county boards are seldom completely free from personal interest and outside influences, but the Sherman Act was not intended to regulate this type of activity. There is support for this view in that *Noerr* . . . holds that so long as the official's action is itself lawful, the action is without the scope of the federal antitrust laws, even if the motive for the action was a personal one.

*Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341, 342 (9th Cir. 1969).

It will be seen that *Noerr-Pennington* immunity presupposes *Parker v. Brown* immunity: if the governmental or agency action is valid as under state authority (despite anticompetitive effects), then seeking to influence the action and a successful outcome are also exempt. Conversely, for a *Noerr* defense to be valid, the parties induced must be public, as opposed to private, entities and legitimately acting as such. To the extent that *Noerr* immunity is based on the First Amendment right to petition, *Noerr, supra,* 365 U.S. at 137–38, 81 S.Ct. 523, *Trucking Unlimited, supra,* 404 U.S. at 510–11, 92 S.Ct. 609, it is the right to petition the *government* that is involved.

> Since the governmental actions of the city council and its committees were not themselves subject to the Sherman Act, the same was true under *Noerr* of concerted efforts to induce those governmental actions, even though those efforts had the anticompetitive purpose and effect alleged by plaintiff, if those efforts were genuinely aimed at inducing the governmental actions and were not a pretext for inflicting on plaintiff an injury not caused by any governmental action.

*Metro Cable, supra,* 516 F.2d at 229.

**III. Violation of State Law vis-à-vis violation of Federal Antitrust Law**

Plaintiff's argument in open court that by violating the state regulatory scheme the defendants have thereby violated as well the federal antitrust laws is likewise faulty. A violation of a state law

(assumed here arguendo), albeit a regulatory scheme affecting commercial activity, is not by that fact alone a violation of the federal antitrust statutes, *cf. Sun Valley, supra,* 420 F.2d at 343:

> A plaintiff cannot, by charging a conspiracy, turn what is basically a claim of violation of state law into a federal antitrust case. This conclusion finds support in the general reluctance of the federal courts to act before state remedies have been exhausted where there is adequate state review.

■ As the Supreme Court stated in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 512, 60 S.Ct. 982, 1002, 84 L.Ed. 1311 (1940) (labor violence during a strike):

> the Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to "monopolize the supply, control its price, or discriminate between its would-be purchasers." [Quotation from *United Leather Workers v. Herkert Co.,* 265 U.S. 457, 471, 44 S.Ct. 623, 68 L.Ed. 1104 (1924).]

Similarly, in *Hunt v. Crumboch,* 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945) (union refusal to deal with a certain trucker, forcing him out of business) the Supreme Court said of the Sherman Act:

> That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.

*Accord, Larry R. George Sales Co. v. Pool Attic Corp.,* 587 F.2d 266, 272 (5th Cir. 1979). In the leading Sixth Circuit case, *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), the Court of Appeals affirmed the dismissal of a Sherman Act complaint charging that plaintiff's competitor had maliciously persuaded plaintiff's supplier to terminate plaintiff as a distributor in order to obtain the business for himself, *i. e.,* the common law tort of malicious interference with contract. At 318 F.2d at 286 the Court of Appeals said:

> Whether a right of damages exists in some other action based on breach of contract or tort, is not before us in this case. Whether a cause of action exists under the antitrust laws is the sole issue in this case. In that connection it is well settled that tortious conduct against one engaged in interstate commerce or which has an effect on interstate commerce does not automatically constitute a violation of the Sherman Act.

Perhaps the clearest explanation of the distinction between federal antitrust and state common law violations is offered by Judge Talbot Smith in *B & B Oil & Chemical Co. v. Franklin Oil Corp.,* 293 F.Supp. 1313, 1317 (E.D.Mich.1968):

> The attempt is frequently made, with respect to the cases involving termination of dealerships [partially the allegation here, in effect], to employ the antitrust acts as a policing measure. . . . Usually the acts are such as to conceivably come within the ambit of state laws relating to what we may term generically unfair competition (lack of proper notice of termination, pirating of employees, taking over favored accounts, and similar activities). But the antitrust acts do not purport to formulate a code of business morality. They are not tablets of stone for the conduct of business generally. They are directed at one aspect of business life and one only: the preservation of free competition.

Here, of course, even the rationale of free competition is undercut since the state-action *(Parker)* and petition *(Noerr)* defenses operate on the instant facts to remove possible violation of free competition as a relevant legal consideration. Hence the alleged conspiracy is not violative of federal antitrust legislation, and it is not here appropriate to decide whether a state or common law rule has been violated.

Accordingly, defendants' motions for summary judgment will be GRANTED.

IT IS SO ORDERED.